IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

Johnny Rodney Brown,                    )       Civil Action No. 8:14-cv-04566-TMC-JDA
                                        )
                    Plaintiff,          )       **REPORT AND RECOMMENDATION**
                                        )       **OF MAGISTRATE JUDGE**
        vs.                             )
                                        )
Carolyn W. Colvin,                      )
Commissioner of Social Security,        )
                                        )
                    Defendant.          )

        This matter is before the Court for a Report and Recommendation pursuant to Local

Civil Rule 73.02(B)(2)(a), D.S.C., and 28 U.S.C. § 636(b)(1)(B).[1]  Plaintiff brought this

action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final

decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's

claims for disability insurance benefits ("DIB") and supplemental security income ("SSI").[2]

For the reasons set forth below, it is recommended that the decision of the Commissioner

be affirmed.

## PROCEDURAL HISTORY

        On June 17, 2011, Plaintiff filed applications for DIB and SSI, alleging disability

beginning June 9, 2011.  [R. 184–192.]   The claims were denied initially and upon

---

        [1]A Report and Recommendation is being filed in this case, in which one or both parties
declined to consent to disposition by a magistrate judge.

        [2]Section 1383(c)(3) provides, "The final determination of the Commissioner of Social
Security after a hearing under paragraph (1) shall be subject to judicial review as provided
in section 405(g) of this title to the same extent as the Commissioner's final determinations
under section 405 of this title."  42 U.S.C. § 1383(c)(3).

reconsideration by the Social Security Administration ("the Administration").  [R. 83–102, 146–149.]  Plaintiff filed a request for hearing before an administrative law judge ("ALJ"), and on May 14, 2013, ALJ Alice Jordan conducted a hearing on Plaintiff's claims.  [R. 45–82.]

On August 1, 2013, the ALJ issued her decision, finding Plaintiff not disabled.  [R. 29–39.]  At Step 1,[3] the ALJ found Plaintiff met the insured status requirements of the Social Security Act ("the Act") through September 30, 2015, and had not engaged in substantial gainful activity since June 9, 2011, the amended alleged onset date.  [R. 31, Findings 1 & 2.]  At Step 2, the ALJ found Plaintiff had the following severe impairments: bipolar disorder, depression, panic disorder, and personality disorder.  [R. 31, Finding 3.]  At Step 3, the ALJ determined Plaintiff's impairments or combination of impairments did not meet or medically equal the severity of one of the listed impairments.  [R. 33, Finding 4.]  The ALJ specifically considered Listings 12.04, 12.06, or 12.08.  [*Id.* at 33–34.]

Before addressing Step 4, Plaintiff's ability to perform her past relevant work, the ALJ found that Plaintiff retained the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can never interact with the public and can only frequently interact with co-workers and supervisors.

[R. 34, Finding 5.]  Based on this RFC, at Step 4, the ALJ determined Plaintiff was unable to perform his past relevant work as an office worker, a call center employee, or a night

---

[3]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

auditor.  [R. 37, Finding 6.]  However, in light of Plaintiff's age, education, work experience, and RFC, the ALJ determined that there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform.  [R. 38, Finding 10.]  Thus, the ALJ found that Plaintiff had not been under a disability, as defined in the Act, from June 9, 2011, through the date of the decision, nor was he entitled to SSI or DIB based on his applications.  [R. 38–39.]

Plaintiff filed a request for review of the ALJ's decision with the Appeals Council which denied review on October 6, 2014.   [R. 1–5.]  Plaintiff commenced an action for judicial review in this Court on December 2, 2014.   [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ's decision is not supported by substantial evidence and contains multiple legal errors warranting the reversal and remand of the case.  [Doc. 12.] Specifically, Plaintiff contends the ALJ

1.    failed to adequately consider and weigh the medical evidence of record in evaluating Plaintiff's credible limitations [id. at 13–16, 18–25];

2.    failed to properly assess Plaintiff's RFC and to adequately explain his rejection of Plaintiff's limitations [id. at 16–18]; and

3.    failed to meet its burden at Step 5 through proper vocational expert testimony [id. at 26–27].

The Commissioner contends the ALJ's decision should be affirmed because there is substantial evidence of record that Plaintiff was not disabled within the meaning of the Act.  [Doc. 13.]  Specifically, the Commissioner contends the ALJ

1.    properly evaluated the evidence to find that Plaintiff had the RFC for unskilled work [id. at 9–11]; and

3

2.    complied with the regulations in evaluating the opinions of record [*id*. at 11–12.]

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).  Thus, it is not within the province of a reviewing court to

4

determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *See Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994). Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)). Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision). To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual

functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Comm'r*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985);*see also Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is

6

material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court.  *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[4]  With remand under sentence six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98.  The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

---

[4]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence.  *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect. *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990).  Accordingly, the Court will apply the more stringent *Borders* inquiry.

7

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims).   The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. Through the fourth step, the burden of production and proof is on the claimant.   *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).   The claimant must prove disability on or before the last day of her insured status to receive disability benefits.   *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969).   If the inquiry reaches step

8

five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. §§ 404.1572(a), 416.972(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* §§ 404.1572(b), 416.972(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* §§ 404.1574–.1575, 416.974–.975.

### B.    *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* §§ 404.1521, 416.921. When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G). The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined

9

effect of a claimant's impairments and not fragmentize them").  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments.").  If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process."  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

### C.    *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. §§ 404.1509 or 416.909, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.[5]  20 C.F.R. §§ 404.1520(d), 416.920(a)(4)(iii), (d).

### D.    *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant."  *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995).  At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[6] with the physical and mental demands of the kind

---

[5]The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911, 416.925.

[6]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work.  20 C.F.R. §§ 404.1560(b), 416.960(b).

### E.　**Other Work**

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *See* 20 C.F.R. §§ 404.1520(f)–(g), 416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).  To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids").  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[7]  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations).  When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931.  In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work.  20 C.F.R. §§ 404.1569a, 416.969a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that

---

[7]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. §§ 404.1569a(a), 416.969a(a).  A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands. *Id.*  Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing.  20 C.F.R. §§ 404.1569a(c)(1), 416.969a(c)(1).

claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy.").  The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Id.* (citations omitted).

## II.    Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Id.* (internal quotations and citations omitted).

## III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic

12

techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. §§ 404.1527(c), 416.927(c).  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  An ALJ determination coming down on the side of a non-examining, non-treating physician's

opinion can stand only if the medical testimony of examining and treating physicians goes both ways. *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986). Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. 20 C.F.R. §§ 404.1527(d), 416.927(d). However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. §§ 404.1517, 416.917; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability. 20 C.F.R. §§ 404.1517, 416.917. Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716,

723 (4th Cir. 2005) (unpublished opinion).  First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'"  *Id.* (quoting *Craig*, 76 F.3d at 594).  Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain."  *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs."  *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. §§ 404.1528, 416.928.  Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990).  The Commissioner thereafter issued the following "Policy Interpretation Ruling":

15

This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:

...

**FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered. Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990). SSR 90-1p has since been superseded by SSR 96-7p, which is consistent with SSR 90-1p. *See* SSR 96-7p, 61 Fed. Reg. 34,483-01 (July 2, 1996). SSR 96-7p provides, "If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485; *see also* 20 C.F.R. §§ 404.1529(c)(1)–(c)(2), 416.929(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the record.  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria.  *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor.  But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

**Weighing of Opinion Evidence**

Plaintiff contends the ALJ failed to properly consider Dr. Shane Sherbondy's, M.D. ("Dr. Sherbondy's"), opinion of limitations expressed in his [Global Assessment of Functioning ("GAF")] score,[8] in violation of case law and the Commissioner's instructions." [Doc. 12 at 13.]  Plaintiff argues that Dr. Sherbondy's assignment of a GAF score of 45 to Plaintiff was "another way of saying that [Plaintiff] is disabled."  [*Id*. at 14.]  In support of his

---

[8]A GAF score represents a score on a numeric scale of 0 through 100 and is referenced in the *American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders*, fourth edition; it may be used to rate the severity of social, phychological, or occupational functioning.  A GAF score may reflect the severity of symptoms or impairment at the time of the evaluation.  *See Chapman v. Astrue*, C/A No. 07-2868-TLW, 2010 WL 419923 (D.S.C. Jan. 29, 2010).

argument, Plaintiff cites to Administrative Message ("AM")-13066, *Global Assessment of Functioning (GAF) Evidence In Disability Adjudication*,[9] and to *Tickle v. Long Term Disability Plan Of Marathon Ashland Petroleum, LLC.*, 34 F. App'x 909 (4th Cir. 2002). [*Id.* at 15; Doc. 12-1.]  Plaintiff also argues that the ALJ improperly ignored work-preclusive limitations opined by Robin Moody, Ph.D ("Dr. Moody"). [Doc. 12 at 18.]

The Commissioner contends, however, the ALJ appropriately declined to give Dr. Sherbondy's initial GAF score significant weight because it was during a time when Plaintiff was not compliant with medication and was prior to his significant improvement after compliance. [Doc. 13 at 12.]  Additionally, the Commissioner points out that the ALJ was not obligated to accept Dr. Moody's opinion when it was inconsistent with the treatment notes of Dr. Sherbondy, Plaintiff's treating psychiatrist. [*Id.* at 11.]  The Court agrees.

---

[9]Administrative Message ("AM")-13066, effective July 22, 2013, and published on the ADministration's intranet contains internal instructions to SSA adjudicators, including ALJ's, on the interpretation of GAF scores.  AM-13066 acknowledges that the DSM-5 eliminates the GAF based on the American Psychiatric Association finding that the score lacked clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and incorporated questionable psychometrics in routine practice, but reminds adjudicators that they will continue to receive and consider evidence that contains GAF scores.  According to the AM, GAF scores should be treated as opinion evidence.  The extent to which an adjudicator can rely on the GAF rating as a measure of impairment severity and mental functioning, however, depends on whether the GAF rating is consistent with other evidence, i.e., how familiar the rater is with the claimant, and the rater's expertise.

The AM goes on to point out numerous problems with the GAF's reliability, including lack of standardization of the scores.  It advises adjudicators that a GAF score should never be dispositive of impairment severity.  A GAF provided by a treating source cannot be given controlling weight unless it is well supported and not inconsistent with other evidence.  A GAF score should never be equated with particular listing level severity or RFC.  According to the AM, it does not measure the ability to meet the mental demands of work.

The AM advises that advocates basing a disability claim on a low GAF score will have an uphill battle unless there is ample support in the record.  GAF Instructions Issued, http://www.empirejustice.org/issue-areas/disability-benefits/ssi-ssd/ssa-issues/gaf-instructions-issued.html (last visited Nov. 17, 2015).

In considering medical source opinions, such as treating physician opinions, the ALJ is obligated to evaluate and weigh these medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527); *see also* 20 C.F.R. § 416.927. Courts typically "accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Id.* (quoting *Mastro*, 270 F.3d at 178). While the ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, *Craig*, 76 F.3d at 590, the ALJ must still weigh the medical opinion based on the factors listed in 20 C.F.R. §§ 404.1527(c) and 4163927(c).

The opinion of a treating physician is given controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Additionally, Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of

19

> the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

1996 WL 374188, at *4 (July 2, 1996). However, not every opinion offered by a treating source is entitled to deference:

> Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions. In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work. Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. Such opinions on these issues must not be disregarded. However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see also* 20 C.F.R. §§ 404.1527(e), 416.927(e) (stating an ALJ does not have to "give any special significance to the source of an opinion on issues reserved to the Commissioner," such as an opinion that the claimant is disabled, the claimant's impairment or impairments meets or equals a listing, or the claimant has a certain residual functional capacity).

### Relevant Medical History

In his application for DIB, Plaintiff alleges he was hospitalized and terminated from his job in 2011 due to his disability. [R. 190.] Plaintiff stated the impairments limiting his ability to work included: "bipolar, panic disorder, manic depression, stressed, and suicide." [R. 211.] A review of the record evidence shows Plaintiff was being seen by Dr. Bruce Johnston ("Dr. Johnston") of Pine Tree Family Practice for his "nerves" and was being treated with Prozac and Abilify. [R. 367.] Plaintiff presented to certified physician assistant

20

Gabrielle Linder ("Linder") on March 16, 2011, complaining of panic attacks and stating that he has been unable to get in to see his primary care physician, Dr. Johnston.  [R. 301.]  On psychological exam, Linder noted that Plaintiff was alert, nontoxic, well hydrated, pleasant, but appeared uncomfortable; his eye contract was normal, he as awake and alert; oriented X3, normal cranial nerves II-XII sensory and motor WNL; and had normal gait.  [R. 302.] Linder noted that Plaintiff was having significant anxiety and recommended further evaluation and treatment through the emergency room ("ER"), but Plaintiff refused to go to the ER and signed out from the office against medical advice.  [*Id*.]  Linder called to follow up on Plaintiff on March 18, 2011, and Plaintiff indicated he was doing much better and Dr. Johnston had adjusted his medications.  [R. 304.]

On June 8, 2011, Plaintiff was seen by Dr. Keith Nall ("Dr. Nall") with complaints of being disoriented after a fall two days prior. [R. 331.]  Dr. Nall obtained images of the cervical spine and found no evidence of fracture or dislocation. [*Id*.] Dr. Nall also ordered a CT Head scan which showed no areas of abnormally increased or decreased attenuation, no midline shift, or other evidence of mass effect.  [R. 333.]

Records show that on June 9, 2011, Plaintiff was taken by ambulance to the ER of Anmed Health ("AnMed") where he was seen by Dr. Damodhar Nerella ("Dr. Nerella") for an overdose of multiple medications, possibly Lortab and Xanax, related to relationship trouble between Plaintiff and his partner.  [R. 310.]  Plaintiff was alleged to have taken an overdosed on Lortab and Xanax, drank two beers, cut both wrists, and then drove his car and hit a tree.  [R. 320.]  Plaintiff was assessed with bipolar disorder, most recent episode depressed without psychotic features, and he was evaluated with a GAF score of 25.  [R. 311.]

21

Plaintiff returned to Dr. Johnston on July 5, 2011 on follow up for his anxiety and depression, still feeling worthless and helpless, and wishing to die. [R. 373.] Dr. Johnston spent 30 minutes with Plaintiff, including counseling. [*Id.*] Plaintiff agreed to postpone any further thoughts of suicide while they worked together and was encouraged to keep his appointment with Anderson-Oconee-Pickens Mental Health Clinic ("MHC") . [R. 374.]

On July 27, 2011, Plaintiff underwent an initial clinical assessment at MHC by Cheryl Rogers ("Rogers"). [R. 388.] Notes indicate Plaintiff's thought content was of ideas of hopelessness; he was oriented to time, place, person, and situation; his judgment was poor; and he blamed others for his problems. [R. 391.] Plaintiff was able to concentrate, memory was intact, his fund of knowledge was average, and he was assigned a GAF of 52. [*Id.*] The notes indicate that Rogers found Plaintiff's presentation "dramatic and tearful" and found that Plaintiff exaggerated his symptoms. [R. 392.] Plaintiff was noted to be mostly distraught over a break-up. [*Id.*] Plaintiff was noted to have an adjustment disorder coupled with a personality disorder. [*Id.*]

An initial/extended medical physician's medical assessment dated August 29, 2011 was performed by Ann E. Radford ("Radford") of MHC. [R. 393–394.] Radford noted Plaintiff indicated he was always depressed, was sleeping well, had a decreased appetite, had intermittent chronic suicidal ideation, but had instinct to live. [R. 393.] Plaintiff also indicated he felt sane and was prescribed Prozac and Xanax by Dr. Jonston but just took Xanax as needed; he also had a prescription for Seroquel at bed time. [*Id.*] On mental status exam, Radford noted Plaintiff was oriented and cooperative, his appearance and speech were normal, he had no suicidal or homicidal ideation, and no abnormal movement. [*Id.*] Radford advised Plaintiff to continue on Prozac but would not prescribe

22

Xanax.  [R. 394.]  Radford noted that Plaintiff was "clearly axis II and dramatic, histrionic," and she provided Plaintiff feedback on his pathological personality traits and encouraged mindfulness and awareness of how he projects. [*Id.*]

On October 10, 2011, Plaintiff presented to AnMed Health Minor Care with complaints of chest wall pain.  [R. 396.]  Plaintiff's physical exam was normal [R. 397] and notes indicated Plaintiff was advised he could return to work without restrictions [R. 398].

On November 4, 2011, Plaintiff was brought by family members to AnMed Health Emergency Department with complaints of suicidal ideation and plans to shoot himself. [R. 437.]  Plaintiff was transferred by Dr. Nall, on November 7, 2011, to the Patricia B. Harris Psychiatric Hospital for involuntary emergency care.  [R. 439, 524.]  Plaintiff was released on November 22, 2011.  [R. 526.]  Plaintiff's discharge diagnosis stated "Axis I: mood disorder, NOS; benzodiazepine dependence; and Axis II: personality disorder, NOS with narcissistic, borderline and anti-social features."  [R. 535.]  Discharge notes also indicated Plaintiff was alert and fully oriented with intact memory in all spheres, his mood was eurhythmic, his speech pattern and psychomotor activity level was normal, he was sleeping and eating better, and he denied suicidal or homicidal ideation.  [R. 536.] Plaintiff's GAF on admission was a 30 and was a 70 at discharge.  [R. 545.]

On December 22, 2011, Plaintiff returned to Dr. Johnston on follow up indicating that he felt better, had quit smoking, had a better appetite, and was not as depressed or manic.  [R. 712.]  Dr. Johnston encouraged Plaintiff to continue on a healthy diet and to walk for exercise.  [R. 713.]  Plaintiff followed up again with Dr. Johnston on February 8, 2012 unhappy with the way Ativan made him feel, indicating he was still taking Lithium twice a day on most days.  [R. 719.]  Dr. Johnston noted "no significant mood swings since

being on Lithium" although Plaintiff may not eat for several hours and then gorge himself and vomit twice a day. [*Id*.] Dr. Johnston advised Plaintiff to continue a healthy diet, to avoid extremes, and to make sure to take the Lithium twice daily. [R. 720.]

On February 17, 2012, Dr. Moody conducted a mental status exam of Plaintiff at the request of the disability examiner. [R. 722.] Dr. Moody noted that Plaintiff admitted to three past suicide attempts by overdose, gun, and cutting. [*Id.*] Dr. Moody noted that Plaintiff was neatly styled but had poor hygiene, appeared oriented, and had clear speech but was delayed in response. [R. 723.] Dr. Moody also noted that Plaintiff's thought processes were slowed and appeared obsessive at time, his attitude was cooperative but irritable, he appeared of average intelligence, and he had poor memory for remote events. [*Id.*] Plaintiff's concentration was noted as moderately to severely impaired. [*Id.*] With respect to his clinical functional assessment, Dr. Moody noted that Plaintiff could complete light chores when he felt well; could prepare his own meals and drive a car; had unstable relationships with most of his family; denied having any close friends; left home when manic and stayed home while depressed; had very impaired concentration and fair pace and persistence; could carry out simple instructions; could not manage his own funds; and did not appear to exaggerate his symptoms. [R. 724.] Dr. Moody diagnosed Plaintiff with Bipolar I disorder, most recent episode depressed, moderate severe anxiety disorder, NOS, cannabis abuse, and alcohol abuse. [*Id.*]

### GAF Score/Dr. Sherbondy

The ALJ, in assessing the extent of Plaintiff's mental impairment, noted that Plaintiff began attending Dr. Sherbondy's Psychiatric Services in September 2012 and that

> their treating notes document intact memory, normal attention and concentration, good appetite, good energy, good mood, and good sleep. Their notes also document no anxiety, hallucinations or suicidal ideations (Exhibit 22F 3-4). Overall, the record shows that the claimant's symptoms have significantly improved since his hospitalization in November 2011 due to psychiatric treatment and prescription medication.

[R. 35–36.] The ALJ does not address Plaintiff's GAF score; however, the ALJ does address the impairments resulting in the assessment of GAF scores.

The GAF score is a clinical assessment provided by the treating medical provider and involves an evaluation of the patient's "psychological, social, and occupational functioning." *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994). But, as this Court has found, "[w]ithout additional context, a GAF score is not meaningful." *Green v. Astrue*, No. 1:10-cv-1840-SVH, 2011 WL 1770262, *18 (D.S.C. May 9, 2011); *see also Parker v. Astrue*, 664 F.Supp.2d 544, 557 (D.S.C. Mar. 27, 2009) (stating that a plaintiff's "GAF score is only a snapshot in time, and not indicative of Plaintiff's long term level of functioning"). Further, the GAF score, standing alone, is of little significance to the fact finder, as there is no indication of whether it applies to symptom severity or level of functioning or impairment in reality testing or communication or major impairment in several areas and, if in several areas, which areas, and if these areas impact basic work activities. *See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed., text rev. 2000) (describing how the scale is to be used, e.g., the score reflecting the worse of symptom severity and functioning

level); *see also* 20 C.F.R. §§ 404.1521, 416.921 (describing what makes an impairment "severe"). The Administration has even cautioned that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings." *Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed.Reg. 50746–01, 50764–765 (Aug. 21, 2000). "Thus, for Social Security disability purposes, a GAF rating is simply another observation which presumably is subsumed into the medical source's final assessment." *Simpkins v. Astrue*, No. 8:09-cv-855-MBS-BHH, 2010 WL 3257789, at *7 (D.S.C. May 13, 2010), *report and recommendation adopted by*, 2010 WL 3257676.

For numerous reasons, the Court finds Plaintiff's argument to be without merit. As an initial matter, Plaintiff fails to point out specific limitations suggested by Plaintiff's GAF score that were overlooked by the ALJ. Plaintiff refers to Dr. Sherbondy's GAF score assignment of 45 to Plaintiff during his initial psychiatric evaluation on September 2012. [*See* R. 739.] However, Dr. Sherbondy also noted Plaintiff's thought content was normal, memory was intact, attention concentration was normal, and abstraction was normal. [*Id*.] Treatment notes from October 2012 indicated Plaintiff's appetite, energy, mood, and sleep were good; his speech was normal. [R. 738.] Additionally, the notes indicated Plaintiff had no anxiety, suicidal ideations, or hallucinations; his affect was full; his thought process logical; and he was alert and oriented. [*Id*.] Treatment notes from December 2012 contained the same results except Plaintiff was anxious at that time. [R. 737.] And while the ALJ did not specifically mention Plaintiff's GAF score, he did accurately summarize and consider Dr. Sherbondy's treatment notes. [R. 33–34.] The ALJ took Dr. Sherbondy's findings into consideration in assessing limitations related to Plaintiff's difficulties in

26

concentration, persistence, and pace, finding them mild.  [R. 34.]  Further, the ALJ noted that

> The claimant also began attending Sherbondy's Psychiatric Services in 2012, and their treating notes document intact memory, normal attention and concentration, good appetite, good energy, good mood, and good sleep. Their notes also document no anxiety, hallucinations or suicidal ideations (Exhibit 22F 3-4). Overall, the record shows that the claimant's symptoms have significantly improved since his hospitalization in November 2011 due to psychiatric treatment and prescription medication.

[R. 35–36.]

Plaintiff cites to AM-13066 and *Tickle,* 34 F. App'x 909 , in support of his argument that his GAF score should require the imposition of additional limitations and/or a finding of disability; however, the Court does not find that either AM-13066 or *Tickle* stands for Plaintiff's asserted proposition.  As noted above, AM-13066 merely provides instruction to the ALJ that a GAF score provided by a treating source should be treated as opinion evidence and cannot be given controlling weight unless it is well supported and not inconsistent with other evidence.   [*See* FN 9, supra.]   Further, AM-13066 expressly provides that a GAF score should never be equated with particular listing level severity or residual functional capacity.   [Doc. 12-1 at 3–4.] Thus, contrary to Plaintiff's suggestion, the AM does not require the ALJ to give any special consideration to a GAF score outside of the context of the entire record.  Further, *Tickle*, a case where a Plaintiff was denied ERISA benefits but granted SSA benefits, only briefly mentions a GAF score and makes

no mention of how the score was used to determine limitations under either set of rules.

### *Dr. Moody's Opinon*

After reviewing Dr. Moody's opinion in light of the other evidence of record, the ALJ gave Dr. Moody's opinion little weight.  [R. 37.]  The ALJ assigned the assignment of weight as follows:

> Dr. Moody opined that the claimant's concentration is "very" impaired, and he would be limited to carrying out simple instructions.  Dr. Moody's report also noted that the claimant is "very" depressed with symptoms of fatigue, poor sleeping habits, and suicidal ideations.  I note that Dr. Moody performed a one-time examination of the claimant, and the claimant has a history of exaggerating his symptoms (Exhibit 8F at 5).  Additionally, Dr. Moody's opinion and documentation of the claimant's symptoms is not consistent with notes from Pine Tree Family Practice a mere nine days before Dr. Moody's examination that document no significant mood swings since the claimant had been prescribed lithium (Exhibit 16F at 1).  Furthermore, Dr. Moody's opinion is contradicted by the claimant's reported activities of daily living and more recent records from Sherbondy's Psychiatric Services that document good sleep, good mood, intact memory, no suicidal ideations, and normal attention and concentration (Exhibit 22F at 3-4).  For these reasons, I give Dr. Moody's opinion little weight.

[*Id*.]

The law is clear that when an ALJ discounts a treating physician opinion, his decision must "contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  SSR 96-2p, 1996 WL 374188, at *5.  *See also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Rivers v. Astrue*, No. 4:11-cv-01386-TER, 2012 WL 2590498, at *5 (D.S.C. July 5, 2012) (holding that the ALJ

28

"must explain why a treating physician's opinion is discounted or rejected"); *Avant v. Astrue*, No. 4:11-cv-822-DCN-TER, 2012 WL 1952657, at *5 (D.S.C. May 9, 2012), *report and recommendation adopted by*, 2012 WL 1952316 (finding that the ALJ "did not comply with the proper analysis under SSR 96-2p [because he failed to explain] what weight he was giving [the treating physician's] opinions and specify[] what contradictory evidence on which he was relying.").

Here, the ALJ gave very clear and concise reasons for discounting Dr. Moody's extreme limitations. As the ALJ explains, Dr. Moody saw Plaintiff on one occasion, and treatment notes both nine days prior to and months after Plaintiff's visit with Dr. Moody indicate "no significant mood swings since he began taking Lithium"; "recent and remote memory was intact, and his attention and concentration was normal"; "good appetite, energy, mood, and sleep . . . [and he] denied having anxiety, hallucinations, or suicidal ideations." [R. 32–33, 37.] Additionally, the ALJ found the limitations ascribed by Dr. Moody to be inconsistent with Plaintiff's reported activities of daily living which the ALJ found to be no more than moderately restricted. [R. 33, 37.] Lastly, the ALJ found Plaintiff had a history of exaggerating his symptoms and that despite his claims of limitations, the overall record shows Plaintiff's symptoms had significantly improved since his hospitalization in November 2011 as a result of psychiatric treatment and prescription medication. [R. 35, 37.] And while Plaintiff makes numerous arguments in disagreement with the ALJ's findings, Plaintiff fails to direct the Court to any reversible error in the ALJ's analysis.

29

**RFC Evaluation**

Plaintiff argues the ALJ failed to include in Plaintiff's RFC significant limitations resulting from Plaintiff's mental impairments and failed to provide an adequate discussion rejecting those limitations. [Doc. 12 at 16.] Plaintiff argues that Dr. Kevin King, Ph.D. ("Dr. King") found Plaintiff "markedly limited" in his ability to work in coordination with or in proximity to others without being distracted by them" and also found Plaintiff to be "markedly limited" in accepting instructions and responding appropriately to criticism from supervision. [*Id*. at 17.] Plaintiff contends that the ALJ's limitation to "no public interaction" and only frequent interaction with co-workers and supervisors does not sufficiently address Plaintiff's limitations. [*Id*.] The Commissioner contends that the ALJ has articulated a reasonable basis for finding Plaintiff's complaints not fully credible and that the ALJ's finding that Plaintiff could perform unskilled work with no contact with the public and reduced contact with coworkers is supported by the evidence and should not be disturbed. [Doc. 13 at 11.] The Court agrees with the Commissioner.

The Administration has provided a definition of RFC and explained what a RFC assessment accomplishes:

> RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work related physical and mental activities. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule . . . .

SSR 96-8p, 61 Fed.Reg. 34,474–01, at 34,475 (July 2, 1996) (internal citation and footnotes omitted).  The RFC assessment must first identify the claimant's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. 404.1545 and 416.945.  *See id.*  Only after this identification and assessment may RFC be expressed in terms of the exertional levels of work: sedentary, light, medium, heavy, and very heavy.  *Id.*  Additionally, the Administration has determined that in assessing RFC, the ALJ

> must consider only limitations and restrictions attributable to medically determinable impairments. It is incorrect to find that [a claimant] has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain, due to factors such as age or height, or whether the [claimant] had ever engaged in certain activities in his or her past relevant work (e.g., lifting heavy weights.) Age and body habitus (i .e., natural body build, physique, constitution, size, and weight, insofar as they are unrelated to the [claimant]'s medically determinable impairment(s) and related symptoms) are not factors in assessing RFC . . . .

*Id*. at 34,476.

To assess a claimant's RFC, the ALJ must consider all relevant evidence in the record, including medical history, medical signs, laboratory findings, lay evidence, and medical source statements. *Id*. at 34,477.  SSR 96-8p specifically states, "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted ." *Id*. at 34,478.  Thus, an ALJ's RFC assessment will necessarily entail assessing the credibility of any alleged limitations, including assessing the credibility of testimony offered by the claimant.

31

### ALJ's RFC Analysis

In determining Plaintiff's RFC, the ALJ followed a two-step process in which he first determined whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms. [R. 35.] After determining the presence of an impairment or impairments at Step 1, the ALJ, at Step 2, ALJ evaluated the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit the claimant's functioning. [R. 35–37.] Following this two-step process, the ALJ considered Plaintiff's underlying physical and mental impairments and the associated medical records to determine his RFC. [*Id.*]

The ALJ ultimately found that Plaintiff was capable of a full range of work at all exertional levels. [R. 34.] The ALJ also found, however, that Plaintiff's non-exertional limitations limited him to work where he never interacts with the public and only frequently interacts with co-workers and supervisors. [*Id.*] The ALJ explained:

> Despite the claimant's overstated allegations, I recognize that he does have some limitations related to his "severe" impairments, as reflected by the medical evidence. However, I have addressed all of his limitations in the residual functional capacity defined above. The record establishes that the claimant's symptoms are not of such severity as to preclude work activities fitting within these restrictions.
>
> In reaching the above conclusions regarding the claimant's residual functional capacity, I have carefully considered to the opinions of the State agency mental residual functional capacity consultant (Exhibits 7A, 10A). The State agency consultant found marked difficulties in social functioning and moderate limitations in activities of daily living and maintaining concentration persistence or pace (Exhibit 10A at 9). The consultant further found that the claimant would need very limited contact with the general public. I give great weight to

32

the consultant's opinion regarding the claimant's activities of daily living and social limitations because it is supported by the substantial evidence of record, as discussed above. However, I give little weight to the consultant's finding of moderate restriction in concentration, persistence or pace. The consultant issued his opinion on February 21, 2012, and more recent medical records from Sherbondy's Psychiatric Services document that the claimant has intact memory and normal attention and concentration with good sleep and energy (Exhibit 22F at 4). Accordingly, since the State agency consultant's did not have the benefit of reviewing these records, I give little weight to the consultant's opinion regarding the claimant's ability to maintain concentration, persistence or pace. I note that even though I found only mild restriction of concentration, persistence or pace, the vocational expert found unskilled work that exists in significant numbers in the national economy that the claimant can perform.

[R. 36–37.]

### *Discussion*

As Plaintiff points out, Dr. King, a state agency physician, completed a Psychiatric Review Technique on February 27, 2012, with respect to Plaintiff's anxiety, cannabis abuse, and alcohol abuse [R. 112] and determined that the evidence did not meet the severity requirements for "A", "B" or "C" criteria for Listings 12.04, 12.06, 12.08 or 12.09 [R. 113]. Dr. King summarized treatment records from February 2009 (AnMed), June 2011 (Anmed), July 2011, November 2011(AnMed and MHC), August 2011(MHC), December 2011 (Dr. Johnson) and February 2012 (Dr. Moody) and concluded that Plaintiff has credible bipolar disorder, personality disorder, and with a history of "benzo and etho abuse," and, at this time, would have difficulty working with others without special supervision due to his social restrictions. [R. 114–115.] Dr. King noted that he gave the strongest weight to Dr. Johnson and Dr. Moody's findings and that Plaintiff did have some ongoing abuse problems but has reduced his use. [R. 115.] Dr. King also completed a

33

Mental RFC finding that Plaintiff had memory limitations but that his ability to remember locations and work-like procedures, or to understand and remember very short and simple instructions were not significantly limited.  [R. 116.]  Dr. King found Plaintiff's ability to remember detailed instructions, however, was moderately limited.  [*Id*.]  Curiously, however, when assessing Plaintiff's sustained concentration and persistence limitations, Dr. King found Plaintiff moderately limited in his ability to carry out short and simple instructions, but not significantly limited in his ability to carry out detailed instructions. [*Id*.] Dr. King also found Plaintiff moderately limited in his ability to maintain attention and concentration for extended periods; moderately limited in his ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; markedly limited in his ability to sustain ordinary routine without special supervision; and markedly limited in his ability to work in coordination with or in proximity to others without being distracted by them.  [R. 117.]  Dr. King also found Plaintiff not significantly limited in his ability to make simple work-related decisions but moderately limited in his ability to complete a normal workday without interruptions from psychologically based symptoms and moderately limited in his ability to perform at a consistent pace without an unreasonable number and length of rest periods.  [*Id*.]

With respect to his limitations in social interaction, Dr. King found Plaintiff markedly limited in his ability to interact appropriately with the public and to accept instructions and respond appropriately to criticisms from supervisors.  [*Id*.]  Dr. King also found Plaintiff moderately limited in his ability to get along with coworkers without distracting them or exhibiting behavioral extremes and not significantly limited in his ability to ask simple questions and request assistance.  [*Id*.]  In rating Plaintiff's limitations in adaptation, Dr.

King found Plaintiff moderately limited in his ability to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, and to set realistic goals or make plans independently of others, but not significantly limited in his ability to travel in unfamiliar places or use public transportation. [R. 117–118.]

In considering the record evidence regarding Plaintiff's social functioning, the ALJ found that, while Plaintiff alleges debilitating social difficulties, particularly fear in crowds, he reported that he shops in public, and spends time with others watching TV and talking. [R. 33.]  Thus, the ALJ rejected Plaintiff's contention that he should be excluded from exposure to co-workers.  And while Plaintiff disagrees with the ALJ's finding on this issue, Plaintiff has presented no evidence not already considered by the ALJ to establish his inability to interact on a frequent basis with co-workers in a work setting.

The responsibility for weighing evidence falls on the Commissioner or the ALJ, not the reviewing court.  *See Craig*, 76 F.3d at 589; *Laws*, 368 F.2d at 642; *Snyder,* 307 F.2d at 520.  It appears Plaintiff would like this Court to re-weigh the evidence considered by the ALJ and/or require the ALJ to re-weigh the evidence; however, the Court finds the ALJ has already met his duty to weigh the evidence and explain his evaluation of the same.  The ALJ noted that he "addressed all of [Plaintiff's] limitations in the residual functional capacity defined above" and that the "record establishes that the [Plaintiff's] symptoms are not of such severity as to preclude work activities fitting within these restrictions."  [R. 36.] Further, the vocational expert testified that the jobs he identified in light of the RFC restrictions would accommodate frequent interaction with co-workers and, if interaction with co-workers was reduced to an occasional level, the job numbers would be eroded by approximately 25 to 30 percent.  [R. 81.]  Work would be precluded only if Plaintiff could

35

have no interaction with co-employees.  [*Id*.]  The ALJ did not find such an extreme limitation was warranted by the record.

    As stated above, the ALJ, not the Court, is authorized to review the evidence and make conclusions regarding the weight of the evidence. This Court's scope of review is limited to the determination of whether the findings of the Commissioner are supported by substantial evidence taking the record as a whole, *Craig*, 76 F.3d at 589, "and whether the correct law was applied," *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).  Plaintiff has failed to show how the ALJ's weighing of this evidence is in error.

**Step 5 Analysis**

    Plaintiff argues that the ALJ failed to meet his Step 5 burden through the testimony of the vocational expert ("VE") because none of the doctors who expressed an opinion about Plaintiff's level of function opined that Plaintiff had the level of function considered by the VE.  [Doc. 12 at 26.] The Court finds Plaintiff's argument unavailing in light of the fact that the Court has already found the ALJ properly considered and weighed the evidence in determining Plaintiff's RFC.

    As noted above, substantial evidence exists in the record to support the ALJ's decision to exclude from his RFC findings several of the limitations and restrictions alleged by Plaintiff or indicated by Drs. Moody, Sherbondy, or King.  "In questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the [plaintiff's] impairment."  *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993) (citation omitted).  There is, however, no requirement that a hypothetical question contain a function-by-function assessment as required when formulating an RFC.  Rather,

the hypothetical only needs to include all of the claimant's credible impairments. *See Walker*, 889 F2d 47, 50 (noting that a VE's opinion can only be helpful if it is "in response to proper hypothetical questions which fairly set out all of [a plaintiff's] impairments"). Accordingly, if the record does not support the existence of a limitation, the ALJ need not include it in the hypothetical question. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 (3rd Cir. 2005) (noting that "the ALJ must accurately convey to the vocational expert all of a [plaintiff's] credibly established limitations").

Upon review, the Court finds that the hypothetical question to the VE included all of Plaintiff's credible limitations and allowed the VE to provide a helpful opinion as to whether or not occupations existed in the national and local economies that Plaintiff could perform. The ALJ, therefore, properly relied on the VE's testimony in meeting his burden at Step 5.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends the Commissioner's decision be AFFIRMED.

**IT IS SO RECOMMENDED**.

s/Jacquelyn D. Austin
United States Magistrate Judge

November 30, 2015
Greenville, South Carolina